# Susan B. Perry and Henry C. Perry, Appellants, *v.* Isaac Livingston.

*Equity—Finding of fact—Trustee ex maleficio—Evidence.*

On a bill in equity by a husband and wife to have the defendant declared a trustee ex maleficio of an undivided one half interest in land of which the wife held the other half the Supreme Court will not reverse a finding by the trial judge on sufficient evidence, that the defendant, at plaintiff's request, bought the interest, which was in controversy, with the purpose of substituting himself as a friendly cotenant in the place of an unfriendly one, but that he used his own money and bought for himself alone, and not under any agreement to hold the property in trust for the plaintiffs.

Argued April 11, 1899. Appeal, No. 122, Jan. T., 1899, by plaintiffs, from decree of C. P. Luzerne Co., March T., 1898, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity to declare a trust.

EDWARDS, J., of the 45th judicial district, specially presiding, filed the following opinion:

Plaintiffs, in their bill of complaint in this case, allege that the defendant, in securing the title to an undivided one half of a certain piece of land situate in the city of Wilkes-Barre, in his own name, was acting for the plaintiffs as their agent, and that by his refusal to transfer the title to them he is a trustee

ex maleficio. Defendant, in his answer, alleges that he obtained the said title for himself with the full knowledge and understanding of the plaintiffs. There are many collateral facts and questions requiring our attention. The evidence as to these facts and as to the controlling question in the case demands careful consideration at the hands of the chancellor. To secure a reasonably clear understanding of the matters in dispute we make the following specific findings of facts:

1. The title to the land in controversy on December 23, 1865, was in George H. Wells. Subsequent conveyances are as follows: 1865, December 28, George Wells and wife to H. C. Perry and D. W. Perry; 1879, September 2, H. C. Perry and wife to Henry Mahler; 1879, September 2, Henry Mahler to Susan B. Perry, wife of H. C. Perry; 1873, June 18, D. W. Perry and wife executed a mortgage in favor of Jacob Holman, on the undivided one half of said land, to secure a debt of $5,226.64, represented by several notes. These notes and mortgages were assigned to M. B. Holman. Proceedings were had upon one of the notes and the D. W. Perry undivided half of the property was sold at sheriff's sale in 1882, M. B. Holman becoming the purchaser. Thus, according to the title papers, Susan B. Perry and M. B. Holman each was the owner of an undivided half of the property, and were tenants in common.

2. After the sheriff's sale to M. B. Holman, H. C. Perry and Susan, his wife, remained in possession of the whole property. To secure his rights as a tenant in common M. B. Holman brought an action of ejectment to February term, 1884, naming H. C. Perry as defendant. This action is yet pending and not disposed of. For several years no particular effort was made to press the ejectment suit. The transaction which brought about the subsequent dealings between the plaintiffs and the defendant Livingston was the entry of a municipal lien for asphalt pavement against the property in dispute, and the sheriff's sale which followed. The lien was entered in 1890. Judgment was regularly obtained thereon and the property sold early in 1891 by the sheriff to Susan B. Perry, one of the plaintiffs. The sheriff's deed bears date of February 24, 1891. To meet the payment of the lien, taxes and cost of sale, Isaac Livingston advanced the sum of $1,053.83 to the plaintiffs on a mortgage dated February 25, 1891. This mortgage was paid in January,

1898, by J. R. Perry. At this time, 1891, according to the conveyances, M. B. Holman had title to an undivided one half, Susan B. Perry by deed from Mahler in 1879 had one half, and Mrs. Perry had also a sheriff's deed for the whole property as the result of the sale on the municipal lien.

3. The Holman ejectment suit being still open, some preparations were made by the Perrys to defend against it, and a question arose as to the effect of the last sheriff's sale on the Holman title, and whether the rights of the parties had been in any way changed by that sale. Previous to this time the relations between H. C. Perry and the defendant had been of a very friendly character. They had known each other for years. Livingston had already assisted the plaintiffs by the loan already mentioned. They went together to the office of the Hon. John Lynch to see about the Holman case. Mr. Lynch about that time became judge, and the case went into the hands of John T. Lenahan, Esq. Several years elapsed before anything more was done in connection with the case of a definite character. Finally, in the autumn of 1897, Mr. Lenahan advised Mr. Perry that the Holman title was still valid and was not affected by the sale on the municipal lien, and that the best way out of the difficulty was to buy Holman's title. Mr. Lenahan said this to Mr. Perry and to Mr. Livingston. It was suggested that Mr. Livingston should buy the Holman title. This was agreed to by the parties and steps were immediately taken to consummate the arrangement. Whether Livingston was to buy the Holman interest for himself or for the Perrys is the real question in the case.

4. Holman lived in another part of the state. The defendant had an interview with him which resulted in an option, by the terms of which the Holman interest was to be purchased by the defendant for $1,900. The defendant returned to Wilkes-Barre and on November 5, 1897, he secured a quitclaim deed from the Perrys, releasing any claim they might have to the Holman half. In a day or two the defendant settled with Holman, obtaining from him a deed bearing the same date, viz: November 5, 1897.

5. During the week following November 5, 1897, H. C. Perry and the defendant had several interviews. They met on Sunday on the property and discussed improvements and

changes. Then and afterwards they discussed the question of insurance, and in Mr. Lenahan's office there was a dispute between them as to the payment of the charge for asphalt pavement,—whether Mr. Perry should pay the whole of it or only half. There was an interview also in Livingston's house. These discussions covered a period of four or five days. The amicable relations between the parties then ended abruptly. Mr. Perry refused to have further converse with Mr. Livingston, Perry alleging that Livingston acted for him and his wife in the purchase of the Holman title, with the understanding that the whole property was to be sold and all claims paid, the surplus to go to the Perrys, and Livingston alleging that he bought the Holman title for himself, with full knowledge of the fact on the part of the plaintiffs.

6. According to a contract offered in evidence it appears that the plaintiffs, H. C. Perry and Susan Perry, on January 18, 1898, sold to Hannah Perry all their interest in the property in dispute, stated in the contract to be an undivided one half, agreeing also to vacate the premises by April 1, 1898, the plaintiffs to have a house on Kulp street free from rent for one year.

7. A considerable portion of the testimony relates to the unsettled and unadjusted accounts between the tenants in common. When D. W. Perry and H. C. Perry bought the property in 1865, it is claimed by H. C. Perry that he paid nine tenths of the purchase money, and that D. W. Perry paid only one tenth. It appears also that J. R. Perry, under an agreement with H. C. Perry and wife, built two or three houses upon the property some time in 1886, four years after Holman secured his title at sheriff's sale. J. R. Perry was to receive the rent of one of the houses until his bill was paid. This account with J. R. Perry is unsettled, and was at one time the occasion of some dispute between the two brothers, J. R. Perry and H. C. Perry. It is evident that there is a long accounting which has not been had, covering a period of probably more than thirty years. For much of this period H. C. Perry and his wife have been in possession of the whole property, receiving rents. Improvements and repairs have been made and taxes have been paid. These accounts between the tenants in common and their equities, as such, cannot be considered in this case. The purpose of this evidence and of the offer of the title obtained by Susan Perry

at the sale on the municipal lien was to show that she had a bona fide claim of title to the Holman interest. But it is not necessary to discuss this part of the evidence at any length. We are clearly satisfied that M. B. Holman at the sheriff's sale in 1882 obtained a good title to the undivided one half of the property which was in the name of D. W. Perry, and that Holman conveyed this same title to the defendant in November, 1897. The state of the accounts between the tenants in common is at present immaterial.

8. The foregoing facts are a part of the history of this case. They are not conclusive as to the real contention between the parties, but it has been necessary to narrate them because they lead naturally to the question that controls the case. In obtaining the title from Holman, did the defendant purchase it for himself or for the plaintiffs? Was he to hold the title in trust for the plaintiffs until the property could be sold, when the defendant would be reimbursed for the money expended by him and the surplus go to the plaintiffs? Or did he, in good faith and without violation of confidence and trust, procure the Holman interest for his own use? On this point, after considering all the evidence, we find that the purchase of the Holman interest by the defendant was made with his own money, to secure for himself the title to the undivided one half of the property. While this was done by the defendant from friendly motives and to help the plaintiffs, by substituting the defendant for Holman as Mrs. Perry's cotenant, or, in other words, by substituting a friend for an adverse antagonist and thereby facilitating the settlement of the ejectment suit, nevertheless, the defendant did not buy said title for the plaintiffs, nor did he in any way become their trustee. Without regard to the rule of evidence defining the quality of testimony necessary to create a trust in land and to defeat a legal title, and even conceding that, owing to the relations existing between the defendant and plaintiffs, there is a burden cast upon him to prove his good faith in the transaction, we are satisfied that the defendant has fairly met this requirement and has established his contention by preponderating testimony.

### CONCLUSIONS OF LAW.

The legal principles applicable to the facts of this case will

be incidentally considered in the further discussion of it. We make the following formal finding :

The plaintiffs have not made out such a case as entitles them to relief in a court of equity. The bill should be dismissed.

Plaintiff's request and the answer thereto were as follows :

As conclusions of law we respectfully ask the court to find that all the prayers of the bill be granted and that defendant be allowed nothing for expenditures made by him. *Answer :* The request is refused.

### DISCUSSION BY THE COURT.

**1.** The eighth finding of fact determines this case in favor of the defendant. It is not without careful analysis and consideration of the testimony that we have arrived at this conclusion. The testimony of H. C. Perry and his wife, Susan Perry, is positive in its character. They both testify that the defendant acted as their agent in the purchase of the Holman interest, the arrangement being that the whole property was to be afterwards sold, the debts, including the money paid Holman, to be first paid, and the balance remaining to be paid to the plaintiffs. Husband and wife agree in their version of the interviews they had with the defendant. Both testify that when the defendant suggested that he should buy Holman's interest for himself, the husband said he would not go into partnership again "if an angel came down from heaven." The notes of testimony show many such emphatic and positive declarations. The defendant on the other hand is just as emphatic and fervid in his denials and protestations. While they agree on many minor and correlative facts and incidents, they are utterly at variance with each other as to the main contention. The testimony leaves an impression upon the mind that up to the final disruption of their friendly relations, the parties were acting at cross-purposes, each seeming to proceed upon the supposition that there was no misunderstanding of any kind between them. This impression is produced more particularly by the testimony of the parties themselves. The evidence of the parties immediately interested being so contradictory, it is our duty to examine the facts and circumstances of the case and the testimony of other witnesses, for corroboration.

(*a*) Friendly relations of the parties. These relations undoubt-

edly existed. Mr. Perry sought Mr. Livingston's advice. The latter aided the former in many ways. He gave him material assistance by advancing money to pay the municipal lien and other charges. He accompanied him to the offices of the attorneys. Plaintiffs claim that by reason of these friendly associations they were led to confide in the defendant and permitted him to proceed with the purchase of the Holman title in his own name, but for their benefit, and that he took advantage of their confidence to his own profit. Counsel for defendant insist that friendship, so far from militating against their position, furnishes the strongest corroboration, because a friend became a cotenant instead of an enemy, and that the settlement of the long pending ejectment suit would speedily follow. In our opinion the claim of friendship corroborates one side as much as the other. The acts of both parties are consistent with the amicable relations existing between them. We do not think the evidence establishes such a confidential relation between the plaintiffs and the defendant as the law contemplates for the production of the result claimed by the plaintiffs. But if it did, we are satisfied that the defendant even then has fully met the responsibilities of such a situation.

(*b*) The evidence of J. R. Perry. This witness is the brother of one of the plaintiffs. He and his wife by contract in 1898 secured the title to Susan Perry's half of the property. So far as the contest in this case is concerned, they have taken the place of the plaintiffs. In his testimony, J. R. Perry corroborates the plaintiffs, especially H. C. Perry, in many particulars. He testifies to declarations by Livingston to the effect that he, Livingston, was desirous of helping H. C. Perry, and that he had advanced money to him to pay off the liens and that the property should be sold to the highest bidder, so that "Henry" would know where he stood. This conversation was in 1892, and referred more particularly to the transactions connected with the sheriff's sale on the municipal lien. There were other interviews, one about 1895, and the other in October, 1897, at each of which defendant said he was anxious to help Henry out of his troubles. There was an unsettled account between the two brothers arising from the building of certain houses on the property. It was the occasion of a dispute between them. Livingston wanted J. R. Perry to make a statement of his account

so that the matter might be settled. In the discussion of these accounts at the October, 1897, interview, J. R. Perry suggested to Livingston that as he was acting for Henry, he had better buy the Holman title. Livingston replied, "Why don't you buy it?" Perry said that he did not want to interfere because he, Livingston, was Henry's friend and should carry the matter through, although he was willing to refund to Livingston the amount to be paid Holman. This is briefly the substance of J. R. Perry's testimony. It is rightly claimed by the plaintiffs that this testimony is corroborative of portions of their evidence and tends to strengthen their contention.

(c) The quitclaim deed of November 5, 1897, from the plaintiffs to defendant. Susan Perry had a sheriff's deed of the property as sold on the municipal lien. This deed on the face of it gave her the title to the whole property. It is true that as between tenants in common their rights remained the same and that the sheriff's sale inured to the benefit of both, subject to an account between them; but the plaintiffs had evidently considered the subject of the extinguishment of Holman's title by the sheriff's sale, and lawyers had been investigating the question. It was important, therefore, that the Perrys should recognize the validity of the Holman title to an undivided one half before anybody would undertake to buy it. The plaintiffs executed the quitclaim deed in the presence of a notary public. Their contention as to this deed is that Livingston informed them that Mr. Lenahan, their attorney, said it was all right. Outside of the testimony of the parties themselves it appears from the clear testimony of the notary that the quitclaim deed was executed with the usual formalities. Mr. Perry looked over it, having it in his hands for a short time, and after Mr. Perry had left the room the notary explained the contents of the deed to the wife, taking her separate acknowledgment. We cannot avoid the conclusion that the plaintiffs understood the nature of the instrument which they signed. It may be said, from the standpoint of the plaintiffs, that this may be true and still consistent with their claim that Livingston was acting for them, the quitclaim deed being a part of the means necessary to accomplish the object in view. Nevertheless, it appears to us that the obtaining of this deed by Livingston before closing the transaction with Holman is a fact that fits in logically

with the defendant's position in this case. It was the right and the reasonable thing to do under the circumstances, and it is in harmony with the suggestion of Mr. Lenahan, who at that time was the plaintiff's attorney.

(*d*) The testimony of Judge Lynch and Mr. Lenahan. Both parties rely on the testimony of these two witnesses for corroboration of their respective positions. Judge Lynch's testimony tends to prove the existence of friendly relations between the Perrys and Livingston in 1891, and Livingston's apparent desire to help the Perrys in connection with the proceedings on the municipal lien. Mr. Lenahan's testimony bears more closely on the material point in the case. He testifies to the friendly interest shown by Livingston in the affairs of the plaintiffs. In two important particulars Mr. Lenahan corroborates the defendant. Perry charged Livingston with deceiving him as to Mr. Lenahan's advice in regard to the quitclaim deed. Following in part is the testimony of Mr. Lenahan on this point: "I remember Mr. Livingston coming into my office one day and asking me what I thought about his getting that title from the Holmans. I said, 'Do that; that is just the thing to do.' And he went away and came back in a week or two after that and he had the title. I don't know how long it was after that he had the title and he said to me, 'Now there is no question about this title, is there?' I said: 'Of course there is the lawsuit pending over there yet.' Mrs. Perry might push it, or Perry, or whoever it was that were the defendants, and 'the only way,' said I, 'to prevent any litigation about it would be to get a paper of Mrs. Perry of some kind setting forth that she had no defense in this thing,' or a deed, something of that kind—something mentioned about a deed or paper. I went away then. He asked me if I would draw it up, I said, 'No, I am going away. I am going to Tunkhannock.' I think I had a lawsuit up there. Next thing I knew, one of the Perrys came to me and asked me if I had authorized the drawing of this deed, but I found out that the deed they got from Perrys embraced the whole of the land,—I understood so from someone that it embraced the Holman interest and the other half; some one told me that, I don't know who told me. Some one told me about it and I said I never authorized such paper as that— to cover the whole property."

On this same subject on cross-examination Mr. Lenahan says : " Q. In reference to this quitclaim paper whether or not you directed your clerk in the office to go out and get a blank and prepare that deed when you had to go away? A. I directed him to get some kind of a deed. Q. Mr. Battle? A. Yes, sir. Q. Your stenographer or clerk? A. Yes, sir. Q. Then if the deed had been for the undivided one half of the property, it would have been in accordance with your instruction? A. If the deed was for the undivided half, yes. Q. And the reason why you said you had not authorized such a deed was because you understood the deed covered the whole property? A. That is what I was told, yes, sir; I was told by two or three parties. Q. In other words, if the deed that was drawn between them was for the undivided one half, wherein M. B. Holman now claims title under Perry, the remaining one half being left in the parties first named—that is, in H. C. and Susan B. Perry, subject to a mortgage in favor of Isaac Livingston, that would be in accordance with your instructions and understanding? A. Yes, sir."

Another point on which Mr. Lenahan corroborates the defendant is as to the proportion each of the parties should pay of the bill for the asphalt pavement. Perry claimed that Livingston should pay half the bill. Livingston in answer said that if that were right the Perrys should account for half of the rent. As to this matter Mr. Lenahan testifies as follows : " Q. When Perry and Livingston came to your office, after Livingston had bought out the Holman title, did they come there together? A. I remember one evening they came there; they may have been there before. Q. And that was the time when the question was raised as to the interest J. R. Perry had in the property? A. Yes, sir. Q. The purpose of their visit there was to get Isaac Livingston a valid title to one half of that property? A. They talked there about making arrangements satisfactory all around. Q. Mr. Perry wanted Livingston to pay for one half the asphalt street, did he not? A. There was talk of that, yes. Q. And Mr. Livingston said he would leave it to you to say whether he should pay half for the asphalt? A. Here is the way that came up. He said Livingston ought to pay one half that asphalt and I said, 'Henry, I don't know, I think you got the better of this thing because between

Holman and Livingston,' I said, 'if they would pursue you for the rents, the rents would amount to a good deal more.' I sat down and figured them. I says, 'You see that will amount to a great deal more than the asphalt.' I think the whole amount of asphalt was $200 or $300— the whole amount; that is my recollection of it. Q. You decided if Henry insisted that Livingston should pay half the asphalt, he would have to pay Livingston half the rent? A. Livingston, from the time he bought, and the Holmans, from the time preceding the other. That was submitted to me as matter of equity."

(e) There is considerable other testimony in the case which corroborates the defendant's contention. Solomon Bacharach, a son-in-law of Livingston, testifies to declarations by Perry as to the purchase of the Holman title by Livingston, and as to the asphalt dispute, which cannot be reconciled with the theory of the plaintiffs. Mrs. Bacharach and Miss Livingston, daughters of the defendant, among other things gave the declaration of Mr. Perry when he said he was glad that Livingston was now a partner of his wife Susan in the property. The testimony of Louis Hartman, a carpenter, is important. The Sunday after November 5, 1897, Mr. and Mrs. Perry and the defendant met on the property. Mr. Hartman was called into the discussion as to the improvements to be made. The conduct and declarations of all the parties on this Sunday are inconsistent with the plaintiffs' claim. Reference should be made to the incident relating to the insurance of the property, also to the sale of only an undivided one half by the Perrys to J. R. Perry in 1898, and the recital as to their title in the contract of sale.

Taking everything into consideration, we cannot fail to conclude that our eighth finding of fact is abundantly warranted by the evidence.

The questions of law involved in this case are few. There can be no contention as to the legal effect of the sheriff's sale on the municipal lien to Susan Perry. The law is well settled. "If a tenant in common purchases, with his own money, in the name of another or in his own name, the estate in common at a tax sale, the purchase inures to the benefit of all the tenants in common. All that the purchaser can demand from the others is contribution to the expenses by which the common interest has been relieved from embarrassment:" Tanney v. Tanney, 159 Pa. 277.

We have not discussed the operation of the statute of frauds on the rights of parties. The creation of a trust in land must be in writing. A party claiming to come within the exception must have a bona fide claim to the land which is the subject of the trust. "Where one has a bona fide claim, whether valid or not, to certain land, and is induced to confide in the verbal promise of another that he will purchase the same for the benefit of the former at a sheriff's sale, and in pursuance of this agreement, allows him to become the holder of the legal title, a subsequent denial of such promise by the purchaser is such a fraud as will convert him into a trustee ex maleficio: " Wolford v. Herrington, 86 Pa. 39.

We have given the plaintiffs the benefit of the principle announciated in the above case so far as it relates to a bona fide claim on their part to the Holman interest. We do not consider it valid, but this seems to make no difference.

Now, therefore, February 4, 1899, the above case having been heard in open court in accordance with the equity rules, after due consideration, it is ordered and adjudged that the plaintiffs' bill be dismissed at the cost of the plaintiffs.

*Error assigned* was the decree of the court.

*D. L. Rhone*, with him *J. Q. Creveling*, for appellants, cited Hill on Trustees, secs. 160, 162; Harrold v. Lane, 53 Pa. 268; Wolford v. Herrington, 86 Pa. 39 ; Beegle v. Wentz, 55 Pa. 369 ; Boynton v. Housler, 73 Pa. 453 ; Darlington's App., 86 Pa. 512; Miskey's App., 107 Pa. 611; Shea's App., 121 Pa. 302; 1 Story's Eq. Jur. sec. 323 ; Seichrist's App., 66 Pa. 237 ; Rankin v. Porter, 7 Watts, 387 ; Christ v. Diffenbach, 1 S. & R. 464.

*Henry A. Fuller*, with him *Henry, W. Palmer*, for appellee, cited Sower v. Weaver, 78 Pa. 443.

PER CURIAM, May 8, 1899:

A careful consideration of this record, aided by the able argument of the learned counsel for appellant, has not convinced any of us that the learned judge of the forty-fifth judicial district who specially presided at the hearing, etc., committed any error that requires either a reversal or modification of the decree.

On the contrary, we are satisfied that his findings of fact were warranted by the pleadings and proofs and that there is no substantial error in any of his rulings or conclusions of law.

A detailed consideration of the specifications of error would necessarily lead us over a very considerable part of the ground covered by the learned trial judge, and end in consuming much time to no useful purpose. Aside from that, we are satisfied that neither of the questions involved requires extended comment.

On the facts found by the court below and the conclusions correctly drawn therefrom, we think the decree should not be disturbed.

Decree affirmed and appeal dismissed at appellants' costs.